KL/JRS:LS/SP/SR
F. #2025R00217

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        - against -

IMAM NAKHMATULLAEV,
SVJATOSLAV JAKOVLEV,
ERIK JUERGENS,
    also known as "Erik Jurgens,"
JAAN JUERGENS,
    also known as "Jaan Jurgens,"
ILJA KARUNAS,
JURI KARUNAS,
JASON ONOUFRIENKO,
RENEK TIKU,
VLADISLAV TURASKIN,
KEVIN VALDHANS, and
VJATSESLAV ZOGOLEV,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**FILED**
**IN CLERK'S OFFICE**
**US DISTRICT COURT**
**E.D.N.Y.**
**\* JUNE 18, 2025 \***
**BROOKLYN OFFICE**

I N D I C T M E N T

Cr. No. _____ **25-CR-203** _____
(T. 18, U.S.C., §§ 982(a)(1), 982(a)(7),
982(b)(1), 1347, 1349, 1956(h), 2 and
3551 et seq.; T. 21, U.S.C., § 853(p))

**Judge Frederic Block**
**Magistrate Judge Lara K. Eshkenazi**

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    Overview

        1.    In or about and between 2022 and the date of this indictment, a

transnational criminal organization (the "Organization"), based in Russia and elsewhere,

orchestrated a multi-billion-dollar health care fraud and money laundering scheme (the

"Scheme") to target, exploit, and steal from the Medicare program ("Medicare") and private

health insurance companies contracted to provide Medicare supplemental insurance policies that

help pay for the beneficiary's share of Medicare expenses ("Medicare Supplemental Insurers"). The defendants were members of the Organization.    To date, the Organization has submitted or caused the submission of over $10 billion in fraudulent Medicare claims for durable medical equipment or "DME."

2.    The Organization purchased dozens of DME companies ("Scheme DME Companies") from prior legitimate owners that already had the ability to submit claims to Medicare and Medicare Supplemental Insurers.    The Organization executed these purchases by paying foreign nationals and others to serve as nominee owners of the Scheme DME Companies. The Organization created fictitious corporate records that falsely indicated that the nominee owners controlled the Scheme DME Companies when, in truth and fact, the Organization's foreign-based leadership maintained control.

3.    After the Organization gained control over the Scheme DME Companies, it rapidly submitted billions of dollars in false and fraudulent health care claims to Medicare for DME that it did not provide.    The Organization did so by stealing the identities and personal identifying information of more than one million Americans spanning all 50 states, including elderly and disabled Americans.    Hundreds of thousands of Americans reported their concerns to Medicare and its contractors after receiving explanation of benefit forms that reflected them purportedly receiving DME that they did not in fact receive, that was purportedly prescribed by doctors whom they had never visited, and purportedly delivered from DME companies with which they were unfamiliar.

4.    Through its Scheme, the Organization also exploited the United States' financial system.    Medicare and Medicare Supplemental Insurers paid the Scheme DME Companies not only by wire transfer, but also by paper check.    In such instances, the

Organization needed to convert these checks into fungible money to realize its substantial fraudulent profits and to transport the money abroad.   To effectuate this, the Organization leveraged United States financial institutions in order to deposit the checks and transfer the funds out of financial accounts, and, in doing so, exposed United States banks to substantial compliance risk.   The health care fraud proceeds were particularly susceptible to laundering because they originated from legitimate sources—Medicare and established private insurance carriers—giving the funds the initial appearance of legitimacy.

5.    To gain access to the United States' financial system, the Organization deployed a range of tactics to circumvent the anti-money laundering controls at multiple financial institutions.   To open financial accounts, the Organization armed its nominee owners, many of whom were not lawfully present in the United States, with false sale documentation and false corporate registration documents.   This documentation falsely reflected that the nominee owners maintained beneficial ownership and control of the Scheme DME Companies for which they were attempting to open accounts and disguised the true beneficial ownership and control of the entities and the accounts.   This allowed the Organization to remain hidden but able to profit from the Scheme.   Moreover, the use of the Scheme DME Companies' names to open financial accounts allowed the Organization to benefit from the illusion of legitimate commercial activity within the health care market.

6.    Upon opening the financial accounts, the Organization funneled fraud proceeds from Medicare and other legitimate health care insurers into the accounts as seemingly "clean" money.   From there, the Organization siphoned off the funds to shell companies and to various banks overseas, including banks in China, Singapore, Pakistan, Israel, and Turkey.   To further conceal the trail of money, the Organization used cryptocurrency to launder stolen funds.

7.      The Organization constantly evolved, recruiting new nominee owners, stealing new identities, and acquiring new Scheme DME Companies to replace those shut down by law enforcement.   This evolution was made possible through the Organization's extensive use of virtual private servers ("VPSs") to execute nearly all digital aspects of the Scheme.   The VPSs allowed the Organization to use a cyberinfrastructure that helped conceal conspirators' true physical locations, mask Organization IP addresses, and scale fraudulent operations internationally.   Among other things, the Organization used the VPSs to communicate via email with prospective sellers of the Scheme DME Companies and their brokers; access electronic medical records and bank accounts; and sign documents necessary for the purchase of the Scheme DME Companies.   The Organization also routinely engaged in communications with nominee owners, employees, and others through encrypted messaging platforms.

8.      As agents closed in on various conspirators, supervisory members of the Organization directed several members conducting Organization business in the United States to flee the United States through the United States border with Mexico to avoid arrest.

II.    Background

A.    Medicare and Related Concepts

9.      Medicare was a federally funded health insurance program that provided health benefits to individuals who were 65 years of age or older or disabled.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the U.S. Department of Health and Human Services.

10.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

11.     Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries."   Each beneficiary was given a unique Medicare identification number.

12.     Medicare covered different types of benefits, which were separated into different program "parts."   Medicare Part B covered medically necessary physician services and outpatient care, including DME, such as prosthetics, orthotics, continuous glucose monitors, urinary catheters, and braces.

13.     DME companies, physicians, and other health care providers (collectively, "providers") that provided items or services to beneficiaries were able to apply for and obtain a National Provider Identifier ("NPI").   To participate in Medicare, providers were required to submit an enrollment application.   As provided in the application, every provider was required to meet certain standards to obtain and retain billing privileges with Medicare, including: (a) provide complete and accurate information on the application, with any changes to the information on the application reported within 30 days; (b) disclose persons and/or organizations with ownership interests or managing control; (c) abide by applicable Medicare laws, regulations, and program instructions; (d) acknowledge that the payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (e) refrain from knowingly presenting or causing another to present a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.   Providers were provided with online access to Medicare manuals and service bulletins describing proper billing procedures and billing rules and regulations.

14.     Upon a change in ownership for an enrolled Medicare provider, the provider was required to re-submit an enrollment application setting forth details of the new ownership, including the names of all owners and managing employees, contact information, and a certification by any new individuals that they would abide by Medicare rules and regulations.

The enrollment application was required to be approved by Medicare before the provider could be reimbursed for claims following a change in ownership.

15.     If Medicare approved the enrollment application, Medicare assigned the provider a Medicare Provider Identification Number ("PIN" or "provider number").   Providers assigned a Medicare PIN to render services to beneficiaries could submit claims for reimbursement to Medicare that included the PIN assigned to that provider.   Payments under Medicare were often made directly to the provider rather than to a Medicare beneficiary.   This payment occurred when providers submitted the claim to Medicare for payment, either directly or through a billing company.   CMS contracted with various companies to receive, adjudicate, process, and pay Medicare Part B claims, including claims for DME.

16.     Under Medicare Part B, DME was required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury, ordered by a medical professional, properly documented, and provided as represented to Medicare.

17.     Medicare used the term "ordering/referring" provider to identify the physician or nurse practitioner who ordered, referred, or certified an item or service reported in that claim.   Individuals who ordered, referred, or certified these items or services were required to have the appropriate training, qualifications, and licenses.

18.     A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the items or services were provided, the cost of the items or services, the name and identification number of the physician or other health care provider who ordered the items or services, and the name and identification number of the provider who provided the items or services.   Providers conveyed this information to Medicare by submitting

claims using billing codes and coding modifiers, which provided additional information about the medical procedure, service, or supply involved.

19.     Medicare regulations required providers to maintain complete and accurate patient medical records reflecting the medical assessments and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom items or services were provided and for whom claims for payment were submitted.   Medicare required complete and accurate patient records so that Medicare could verify that the items or services were provided as described on the claim form and so that Medicare could review the appropriateness of payments made to providers.

20.     Medicare supplemental insurance, also known as Medigap, helped fill "gaps" in Medicare coverage and was sold by private health insurance companies, the Medicare Supplemental Insurers.   Medigap and the Medicare Supplemental Insurers were health care benefit programs, as defined by Title 18, United States Code, Section 24(b).   A Medigap plan could help pay some of the remaining health care costs not covered by Medicare, such as copayments, coinsurance, and deductibles.   For DME claims, a Medigap plan generally covered approximately 20% of the claim amount.   Medicare Supplemental Insurers were contractually obligated to reimburse claims that had been processed by Medicare, even if Medicare subsequently suspended payment of the claims.

B.     The Defendants and Relevant Individuals

21.     The defendant IMAM NAKHMATULLAEV was a supervisory member of the Organization based in Russia and elsewhere.   NAKHMATULLAEV directed, instructed, and supervised other members of the Organization operating in the United States and elsewhere.

22.     The defendant SVJATOSLAV JAKOVLEV was a citizen of Estonia and member of the Organization.   JAKOVLEV served as the nominee owner of two Scheme DME

Companies while residing in New York County, New York and later recruited and supervised other members of the Organization operating in the United States and elsewhere.

23.    The defendant ERIK JUERGENS, also known as "Erik Jurgens," was a citizen of Estonia and member of the Organization.    ERIK JUERGENS served as the nominee owner of two Scheme DME Companies while residing in Kings County, New York.

24.    The defendant JAAN JUERGENS, also known as "Jaan Jurgens," was a citizen of Estonia and member of the Organization.    JAAN JUERGENS served as the nominee owner of three Scheme DME Companies while residing in Kings County, New York.

25.    The defendant ILJA KARUNAS was a citizen of Estonia and member of the Organization.    ILJA KARUNAS served as a courier.

26.    The defendant JURI KARUNAS was a citizen of Estonia and member of the Organization.    JURI KARUNAS served as a courier while residing in Kings County, New York.

27.    The defendant JASON ONOUFRIENKO was a citizen of the United States and member of the Organization.    ONOUFRIENKO served as the nominee owner of two Scheme DME Companies.

28.    The defendant RENEK TIKU was a citizen of Estonia and member of the Organization.    TIKU served as the nominee owner of two Scheme DME Companies, while residing in Kings County, New York.

29.    The defendant VLADISLAV TURASKIN was a citizen of Estonia and member of the Organization.    TURASKIN served as the nominee owner of three Scheme DME Companies while residing in Kings County, New York and later recruited and supervised other members of the Organization operating in the United States and elsewhere.

30.    The defendant KEVIN VALDHANS was a citizen of the Czech Republic and member of the Organization.   VALDHANS served as the nominee owner of three Scheme DME Companies.

31.    The defendant VJATSESLAV ZOGOLEV was a citizen of Estonia and member of the Organization.   ZOGOLEV served as the nominee owner of one Scheme DME Company.

32.    In total, the Organization, including the defendants IMAM NAKHMATULLAEV, SVJATOSLAV JAKOVLEV, ERIK JUERGENS, JAAN JUERGENS, JASON ONOUFRIENKO, RENEK TIKU, VLADISLAV TURASKIN, KEVIN VALDHANS, and VJATSESLAV ZOGOLEV, owned, controlled, and/or operated, directly and indirectly, more than 30 Scheme DME Companies across the United States, including Scheme DME Company 1 and Scheme DME Company 2, both located in Brooklyn, New York, and Scheme DME Company 3, located in Staten Island, New York, each an entity the identity of which is known to the Grand Jury, as well as other DME companies located in Alabama, California, Connecticut, Florida, Georgia, Illinois, Kentucky, Mississippi, Pennsylvania, and Texas.

III.    The Scheme

33.    In or about and between approximately August 2022 and September 2024, the defendants IMAM NAKHMATULLAEV, SVJATOSLAV JAKOVLEV, ERIK JUERGENS, JAAN JUERGENS, ILJA KARUNAS, JURI KARUNAS, JASON ONOUFRIENKO, RENEK TIKU, VLADISLAV TURASKIN, KEVIN VALDHANS, and VJATSESLAV ZOGOLEV, together with others, engaged in the Scheme, which involved submitting and causing the submission of false and fraudulent claims to Medicare and Medicare Supplemental Insurers for DME that was never supplied to beneficiaries and then laundering the proceeds of the Scheme in order to enrich themselves and other conspirators.

34.     In furtherance of the Scheme, the conspirators: (a) purchased DME companies that were already enrolled with Medicare; (b) recruited and installed nominee owners of those DME companies who were responsible for changing the ownership information of the companies with the respective secretaries of state to their own information and obtaining access to the United States banking system and depositing and transmitting the proceeds of the Scheme, usually received by wire or later by paper check, for the Organization's use; (c) concealed and disguised the Scheme by failing to submit legally required enrollment applications to Medicare reflecting the change in ownership; (d) installed storefront employees at the Scheme DME Companies to collect checks received from Medicare and Medicare Supplemental Insurers and deposit them into financial institutions; (e) submitted tens to hundreds of millions of dollars in claims to Medicare and other health care benefit programs for DME, primarily continuous glucose monitors, urinary catheters, and related supplies, that were not medically necessary and were not provided as represented; (f) upon receiving the reimbursements from Medicare and Medicare Supplemental Insurers, used the nominee owners or storefront employees to deposit proceeds into financial accounts controlled by the Organization; and (g) transferred the fraudulent proceeds to other financial accounts, with the majority of the fraudulent proceeds eventually being transferred to accounts located overseas.

35.     The defendants SVJATOSLAV JAKOVLEV, ERIK JUERGENS, JAAN JUERGENS, JASON ONOUFRIENKO, RENEK TIKU, VLADISLAV TURASKIN, KEVIN VALDHANS, and VJATSESLAV ZOGOLEV served as nominee owners of approximately 14 Scheme DME Companies, signing paperwork with various secretaries of state as well as opening accounts with financial institutions falsely representing that they had ownership and managerial control of the relevant Scheme DME Companies, and concealing and disguising that, in fact, others

had ownership and managing control, and that they took actions related to those Scheme DME Companies under instruction from supervisory members of the Organization.   In their capacity as nominee owners, these defendants deposited fraudulently obtained health insurance reimbursements into financial accounts that they opened and engaged in transfers of the fraudulent proceeds to accounts held in the names of other businesses.

36.    Upon the Organization's purchase of each of the Scheme DME Companies that was already enrolled with Medicare as a DME provider, supervisory members of the Organization directed the nominee owners, including the defendants SVJATOSLAV JAKOVLEV, ERIK JUERGENS, JAAN JUERGENS, JASON ONOUFRIENKO, RENEK TIKU, VLADISLAV TURASKIN, KEVIN VALDHANS, and VJATSESLAV ZOGOLEV, to submit false documentation to the respective secretary of state where the Scheme DME Company was located reflecting that the nominee owner controlled the Scheme DME Company.   The Organization used the same registered agent, Registered Agent Company 1, an entity the identity of which is known to the Grand Jury, to process filings transferring ownership through respective secretaries of state to the nominee owners of each of the Scheme DME Companies.

37.    Initially, the Organization almost entirely banked with a single United States financial institution, Financial Institution 1, an entity the identity of which is known to the Grand Jury, often using accounts that had been held by the former owners of the Scheme DME Companies. As Financial Institution 1 became aware of the Scheme and restricted the accounts held by the Scheme DME Companies, supervisory members of the Organization began to direct its nominee owners, including the defendants ERIK JUERGENS, JAAN JUERGENS, JASON ONOUFRIENKO, RENEK TIKU, KEVIN VALDHANS, and VJATSESLAV ZOGOLEV, to open as many accounts as they could with any United States financial institution that agreed to open the

account, considering that, at the time that the accounts were opened, many of these nominee owners had only recently entered the United States and some were not lawfully in the country. Supervisory-level co-conspirators provided documents to the nominee owners to present to the financial institutions falsely documenting that the nominee owners had beneficial ownership and control of the Scheme DME Companies, in order to persuade the financial institutions to open the accounts.

38.    To assist the Organization in its objective of opening financial accounts and exploiting the United States' financial system, the Organization developed relationships with various sympathetic bankers at these financial institutions who assisted the Organization in opening accounts that otherwise should not have been opened or making transfers that otherwise would have garnered additional scrutiny.    As such, supervisory members of the Organization provided specific instruction to the nominee owners, including the defendants JAAN JUERGENS and RENEK TIKU, regarding specific branches to visit and specific bankers to approach with various transactions.

39.    Following the acquisition of the Scheme DME Companies, the Organization caused the Scheme DME Companies to contract with the same billing company, Billing Company 1, an entity the identity of which is known to the Grand Jury, to submit fraudulent claims to Medicare for DME that was never ordered or delivered on behalf of the Scheme DME Companies. Specifically, members of the Organization created accounts on behalf of each of the Scheme DME Companies with Billing Company 1 in the name of each Scheme DME Company's initial nominee owner, including the defendants SVJATOSLAV JAKOVLEV, JAAN JUERGENS, JASON ONOUFRIENKO, VLADISLAV TURASKIN, KEVIN VALDHANS, and VJATSESLAV ZOGOLEV.    The nominee owners executed contracts with Billing Company 1 on behalf of the Scheme DME Companies, and Billing Company 1 corresponded with the nominee owners regarding

the submission of claims and other matters.   The Scheme DME Companies' nominee owners typically maintained a profile with Billing Company 1 in order to log in and submit and/or view claims.

40.    Members of the Organization created the fraudulent claims, and, in doing so, used the NPIs of providers without the knowledge and consent of those providers and listed those providers as referring providers for DME purportedly ordered.   Not only were there generally no visits or provider relationships between the purported referring providers and the beneficiaries, but also the referring providers and the beneficiaries generally had no knowledge of each other, or that the claims were being submitted.   Members of the Organization also used the personal identifying information of beneficiaries to bill for DME in the beneficiaries' names without ever making any contact with them.   Although members of the Organization submitted reimbursement requests to Medicare, virtually no DME was actually sent to beneficiaries.   Medicare and its contractors received over 400,000 complaints from beneficiaries related to billing caused by Scheme DME Companies operated by the Organization.

41.    Initially, before CMS became aware of the Scheme, Medicare paid the Scheme DME Companies for the fraudulent claims via wire transfer and/or check to financial accounts held by the Scheme DME Companies.   Following that reimbursement, the nominee owners of the Scheme DME Companies, including the defendants SVJATOSLAV JAKOVLEV, VLADISLAV TURASKIN, and KEVIN VALDHANS, and other members of the Organization, caused the fraudulently obtained proceeds of the Scheme to be transferred from within the United States to other financial accounts, including those located outside of the United States.

42.    As CMS became aware of the Scheme and began suspending payments to Scheme DME Companies, the Scheme DME Companies relied on Medicare's contractual

agreements with Medicare Supplemental Insurers to profit from the Scheme.   Medicare

Supplemental Insurers typically reimbursed fraudulent claims submitted by the Scheme DME

Companies by paper check issued to the physical location of the Scheme DME Company.   The

Organization installed individuals to serve as storefront employees at the Scheme DME Companies,

and these individuals' primary role was to collect the mail received by the Scheme DME Companies,

segregate the checks received from Medicare or Medicare Supplemental Insurers, and either deposit

those checks into a financial account held by the Scheme DME Company or mail those checks to a

nominee owner of a Scheme DME Company, such as the defendants JAAN JUERGENS and

RENEK TIKU, or to a courier for the Organization, such as the defendants ILJA KARUNAS and

JURI KARUNAS.   The storefront employees took instructions as to the handling of the checks

representing fraud proceeds via encrypted messaging applications from supervisory-level co-

conspirators, whom the storefront employees did not meet in person.

        43.      Upon a Medicare Supplemental Insurer's reimbursing the Scheme DME

Companies for the fraudulent reimbursement requests, nominee owners, including the defendants

SVJATOSLAV JAKOVLEV, ERIK JUERGENS, JAAN JUERGENS, JASON ONOUFRIENKO,

RENEK TIKU, VLADISLAV TURASKIN, KEVIN VALDHANS, and VJATSESLAV ZOGOLEV,

and the storefront employees, were instructed by supervisory members of the Organization to deposit

the checks into financial accounts opened by the nominee owners and held by the Scheme DME

Companies.   At the direction of supervisory members of the Organization, the nominee owners,

including JAKOVLEV, ERIK JUERGENS, JAAN JUERGENS, ONOUFRIENKO, TIKU,

TURASKIN, VALDHANS, and ZOGOLEV, then caused the fraudulently obtained proceeds of the

Scheme to be transferred from within the United States to various common pass-through accounts

before being transferred to financial accounts held outside of the United States.   Approximately 14

common pass-through accounts received transfers from multiple financial accounts of the Scheme DME Companies.

44.    Crucial to ensuring that checks for fraud proceeds were converted into fungible money for the Organization were individuals who were recruited to serve as couriers for the Organization.    Specifically, storefront employees and nominee owners were at times instructed to send packages containing checks from Medicare and/or Medicare Supplemental Insurers to addresses of money couriers or their associates, who were instructed to deposit the checks or transfer fraud proceeds between accounts.    The defendants ILJA KARUNAS and JURI KARUNAS, together with others, served as couriers for the Organization, and, in that capacity, received packages sent from Scheme DME Companies containing checks from Medicare and Medicare Supplemental Insurers, deposited checks from Medicare and Medicare Supplemental Insurers, and/or transferred fraud proceeds for the Organization.

45.    As CMS and Medicare Supplemental Insurers discovered the fraud and ceased reimbursing claims for DME submitted by the Scheme DME Companies, the Organization continued the Scheme by opening new Scheme DME Companies and following the same process described above.

46.    The accessing of Scheme DME Company financial accounts, the signing of purchase documents of Scheme DME Companies, the filing of corporate records for Scheme DME Companies, the accessing of claims billing software, and the accessing of corresponding email accounts in furtherance of the Scheme was accomplished under common Internet Protocol ("IP") addresses, or alphanumeric labels assigned to devices connected to computer networks.    These IP addresses were created through common VPSs, which allow a user connected through the VPS to

have his or her browsing activity encrypted as it passes through the network.   VPS accounts used in the Scheme listed the same account holder or user.

47.     The defendant IMAM NAKHMATULLAEV and others served as supervisors of the Organization, and, in that capacity were responsible for directing and facilitating the actions of nominee owners of the Scheme DME Companies via encrypted electronic messaging applications.   NAKHMATULLAEV, together with other supervisory-level co-conspirators, directed nominee owners regarding assuming ownership of Scheme DME Companies, opening financial accounts for Scheme DME Companies, and transferring fraud proceeds received by Scheme DME Companies.

48.     The Organization generally directed its nominee owners to leave the United States after serving in their roles for several months, initially by airplane, and then, as law enforcement began arresting various conspirators, by vehicular or pedestrian crossing over the United States land border with Mexico.   Upon their departure from the United States, nominee owners served the Organization in other capacities.   For example, once the defendants SVJATOSLAV JAKOVLEV and VLADISLAV TURASKIN left the United States after serving as nominee owners, they continued working for the Organization as supervisors and recruiters. Specifically, JAKOVLEV and TURASKIN assisted in the recruitment and directed the subsequent activities of a nominee owner of two Scheme DME Companies.

49.     In sum, between approximately August 2022 and September 2024, the defendants IMAM NAKHMATULLAEV, SVJATOSLAV JAKOVLEV, ERIK JUERGENS, JAAN JUERGENS, JASON ONOUFRIENKO, RENEK TIKU, VLADISLAV TURASKIN, and VJATSESLAV ZOGOLEV, and their co-conspirators operated approximately 19 Scheme DME Companies across the United States, and, in so doing, caused the submission of approximately $10.6

billion in false and fraudulent claims to Medicare for DME that was not medically necessary and not delivered by the Scheme DME Companies to beneficiaries.   Medicare paid the Scheme DME Companies approximately $41 million as a result of the fraudulent submissions, and Medicare Supplemental Insurers are estimated to have paid the Scheme DME Companies approximately $900 million as a result of the fraudulent claims.

<u>COUNT ONE</u>
(Conspiracy to Commit Wire Fraud and Health Care Fraud)

50.     The allegations contained in paragraphs one through 49 are realleged and incorporated as if fully set forth in this paragraph.

51.     In or about and between August 2022 and September 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants IMAM NAKHMATULLAEV, SVJATOSLAV JAKOVLEV, ERIK JUERGENS, also known as "Erik Jurgens," JAAN JUERGENS, also known as "Jaan Jurgens," JASON ONOUFRIENKO, RENEK TIKU, VLADISLAV TURASKIN, KEVIN VALDHANS, and VJATSESLAV ZOGOLEV, together with others, did:

(a)     knowingly and intentionally conspire to devise a scheme and artifice to defraud Medicare, Medigap, and one or more Medicare Supplemental Insurers and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343; and

(b)     knowingly and willfully conspire to execute a scheme and artifice to defraud one or more health care benefit programs, as defined in Title 18, United States Code,

Section 24(b), to wit: Medicare, Medigap, and one or more Medicare Supplemental Insurers, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS TWO THROUGH FIVE
(Health Care Fraud)

52.    The allegations contained in paragraphs one through 49 are realleged and incorporated as if fully set forth in this paragraph.

53.    In or about and between August 2022 and September 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants SVJATOSLAV JAKOVLEV, JAAN JUERGENS, also known as "Jaan Jurgens," JASON ONOUFRIENKO, and KEVIN VALDHANS, together with others, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud one or more health care benefit programs, as defined in Title 18, United States Code, Section 24(b), to wit: Medicare, Medigap, and one or more Medicare Supplemental Insurers, and to obtain, by means of one or more materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services.

54.    On or about the dates specified below, within the Eastern District of New York and elsewhere, the defendants SVJATOSLAV JAKOVLEV, JAAN JUERGENS, also known as "Jaan Jurgens," JASON ONOUFRIENKO, and KEVIN VALDHANS, together with others,

submitted and caused to be submitted the following false and fraudulent claims, in an attempt to execute, and in execution of the scheme described above:

| Count | Defendant | Beneficiary | Program/ Supplemental Insurer | Item(s) Billed | Appx. Claim Submission Date |
|-------|-----------|-------------|-------------------------------|----------------|------------------------------|
| TWO | SVJATOSLAV JAKOVLEV | L.M. | Medicare/ Transamerica Financial Life Insurance | CGM Supply Allowance and Receiver | 02/09/2023 |
| THREE | KEVIN VALDHANS | D.T. | Medicare | Intermittent Urinary Catheter | 03/24/2023 |
| FOUR | JAAN JUERGENS | R.B. | Medicare/ Transamerica Financial Life Insurance | Intermittent Urinary Catheter & Supplies | 08/08/2023 |
| FIVE | JASON ONOUFRIENKO | B.K. | Medicare/ Transamerica Financial Life Insurance | Intermittent Urinary Catheter & Supplies | 04/02/2024 |

(Title 18, United States Code, Sections 1347, 2, and 3551 et seq.)

COUNT SIX
(Money Laundering Conspiracy)

55.     The allegations contained in paragraphs one through 49 are realleged and incorporated as if fully set forth in this paragraph.

56.     In or about and between August 2022 and September 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants IMAM NAKHMATULLAEV, SVJATOSLAV JAKOVLEV, ERIK JUERGENS, also known as "Erik Jurgens," JAAN JUERGENS, also known as "Jaan Jurgens," ILJA KARUNAS, JURI KARUNAS, JASON ONOUFRIENKO, RENEK TIKU, VLADISLAV TURASKIN, KEVIN VALDHANS, and VJATSESLAV ZOGOLEV, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, from one

or more places in the United States to and through one or more places outside the United States knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: health care fraud, in violation of Title 18, United States Code, Section 1347, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE THROUGH FIVE

57.     The United States hereby gives notice to the defendants charged in Counts One through Five that, upon their conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(7), which requires any person convicted of a federal health care offense to forfeit property, real or personal, that constitutes, or is derived directly or indirectly from, gross proceeds traceable to the commission of such offenses.

58.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(7) and 982(b)(1); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT SIX

59.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Six, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offenses to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

60.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

22

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))

A TRUE BILL

s/

FOREPERSON

By Carolyn Pokorny, Assistant U.S. Attorney

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

By Sara Porter, Trial Attorney

LORINDA LARYEA
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE